# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

SHARON K. SIMS,                    )
                                   )
     Plaintiff,                )
                                   )
v.                                 )     Case No. 12-0163-CV-W-NKL-SSA
                                   )
MICHAEL J. ASTRUE,                 )
COMMISSIONER OF                    )
SOCIAL SECURITY,                   )
                                   )
     Defendant.                )

## ORDER

Before the Court is Plaintiff Sharon K. Sims' Social Security Complaint [Doc. #

9].   For the following reasons, the Court REVERSES the decision of the Administrative

Law Judge.

## I.     Background

This case involves a claim for Disability Insurance benefits under Title II of the

Social Security Act., 42 U.S.C., §§ 410 *et seq*.; 42 U.S.C. §§ 1382, *et seq*.  Plaintiff Sims

contests Defendant's finding that she is not disabled.

Sims filed an unsuccessful application for disability benefits on May 10, 2006.

Administrative Law Judge ("ALJ") Milan Dostal heard Sims' case on April 8, 2008, and

denied benefits.  Sims filed a timely request for review by the Appeals Council, which

denied the request on October 31, 2008.  Sims then initiated a civil action for judicial

review of the Commissioner's decision.  The case was heard by Magistrate Judge John

Maughmer, who remanded Sims' case to the Social Security Administration for rehearing

1

on January 26, 2010, on the issue of Sims' credibility. A rehearing was held on February 7, 2011, before ALJ Lauren Mathon, who again denied benefits to Sims. After the Appeals Council denied Sims' request for review on December 20, 2011, Sims filed a civil action for review in this Court.

### A.    Medical Evidence

Sharon Sims has been diagnosed with diabetes mellitus, hypertension, osteoarthritis of the left and right knees, arthritis of the bilateral hips, osteoarthritis of the left thumb, patellofemoral pain syndrome, bursitis of the right knee, and obesity. Sims originally filed for disability after she had a total left knee replacement in January 2006 as a result of degenerative changes to her left knee. She continued to experience pain in her left knee post-surgery. Sims underwent an arthroscopy in her right knee in November 2006. Sims continued to experience pain and occasional buckling in her right knee, and had difficulty climbing stairs and using the bathtub. In 2007, Sims was diagnosed with patellofemoral pain syndrome. In August 2007, Sims reported that the pain medication Mobic and leg exercises improved her pain, but that her knees chronically ached. In October 2007, Sims received steroid injections in her right and left knees. In March 2008, Sims' doctor observed osteoarthritis and mild deformity changes in the right patella, and recommended additional injections and a knee brace. During this time, Sims also struggled with managing her diabetes and hypertension, as well as her weight, which was 296 pounds.

In May 2008, Sims fractured her left femur following a fall and underwent surgery. Periodic x-rays over the following months indicated that her femur had not

healed, and in September 2008 her physician prescribed the use of a bone stimulator. Sims' fracture was finally pronounced healed in August 2009. During this period, Sims was not weight-bearing on her left leg, and used a walker and a cane for ambulation.

In August 2009, Sims reported ongoing pain in her left hip and knee. Her physicians recommended that she consider a total right knee replacement, and noted that she may require a total hip replacement in the future. In November 2009, Sims received cortisone injections in her right knee to help with pain. At this time, Sims also reported right hip and lower back pain, which her physician noted was secondary to her altered gait due to her right knee derangement. In November 2009, x-rays revealed degenerative changes in both hips, and Sims was given an injection in her right hip for pain. In January 2010, an x-ray of Sims' left hip showed mild degenerative joint disease. Sims received additional injections in her right hip in February and March 2010, and began considering surgical intervention for her right knee and hip. In May 2010, Sims reported that her hip pain was progressively worsening, particularly with weight-bearing. Sims was diagnosed with mild osteoarthritis of the hips and given a steroid injection. Sims also experienced pain in her left thumb, which was diagnosed as mild osteoarthritis. In October 2010, Sims was told she could not have any further injections. During this period, Sims continued to struggle to manage her diabetes, hypertension, and weight, and was diagnosed with depression.

1. *Opinion of Dr. Daily, Treating Physician*

Dr. Jen Daily, a staff physician at Truman Medical Center, began treating Sims in September 2008. Prior to that time, Sims had been seen by other staff physicians at

3

Truman Medical, and Dr. Daily had access to their records as far back as June 2007. Dr. Daily diagnosed Sims with diabetes, hypertension, obesity, depression, degenerative disc disease, sacroiliitis, and delayed wound healing of the left femur fracture.

### 2. *Opinion of Dr. Alexander, Medical Examiner*

Dr. Alexander evaluated Sims in June 2006 at the request of the state disability agency. Dr. Alexander noted that Sims was suffering from osteoarthritis, diabetes mellitus (uncontrolled with early stages of retinopathy), hypertension (controlled), and obesity. He noted that Sims had difficulty bending to take off her shoes because of her size and that Sims ambulated slowly. He also wrote that Sims reported she sometimes has to use an ambulatory device, but that she did not need one that day. He opined that Sims could sit for eight hours, stand for four hours, and walk for two hours.

### 3. *Opinion of Dr. Gamayo, Non-Examining Medical Expert*

Dr. Gamayo evaluated Sims' medical record in 2006 but did not personally examine her. He concluded that Sims was capable of lifting 10 pounds occasionally and less than 10 pounds frequently; could stand or walk at least two hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and could occasionally climb, balance, stoop, kneel, crouch, and crawl. He also noted that Sims experienced difficulty with showering and dressing, could not perform outdoor work, and could do laundry with family assistance.

### 4. *Opinion of Dr. Lofgreen, Medical Examiner*

Dr. Lofgreen evaluated Sims in conjunction with an application for Medicaid in November 2006. Dr. Lofgreen noted that Sims was severely obese and used a cane for

ambulation.  Sims reported pain on manipulation of both knees.  Dr. Lofgreen opined that

Sims had "probably achieved a level of disability incompatible with continued

employment."[1]

### B.      Decisions of the Administrative Law Judges

A claim of disability is assessed via a five-step sequential evaluation.  20 C.F.R. §

404.1520(d) (2012).  The ALJ first asks 1) whether the claimant has engaged in

substantial gainful activity since the alleged onslaught of her disability; 2) whether the

claimant has a severe impairment(s) that limits her ability to engage in basic work

activity; and 3) whether her impairment(s) meets or equals the listing of impairments

promulgated by the Social Security Administration ("SSA").  If the ALJ finds that the

impairment meets or equals one of the listed impairments, the claimant is conclusively

presumed disabled.  If the impairment(s) does not meet or equal the listings, the ALJ asks

4) whether the impairment(s) prevents the claimant from performing her previous

employment, and if so, 5) whether there is other work available in the national economy

that the claimant could perform.  *Id*; see also *Bowen v. Yuckert*, 482 U.S. 137, 141-42,

107 S. Ct. 2287, 2291 (1987); *Fastner v. Barnhart*, 324 F.3d 981, 983-84 (8th Cir. 2003).

1.      *Decision of the ALJ at the 2008 Hearing*

The ALJ at the 2008 hearing ("2008 ALJ") determined that 1) Sims' part-time

work, which she had just begun, was not substantially gainful activity; 2) Sims had the

severe impairments of osteoporosis and obesity, along with other non-severe impairments

including diabetes, hypertension, and depression; and 3) these severe impairments did not

---

[1] TR-243.

meet the Listings because Sims was able to ambulate and use her extremities effectively. Regarding the fourth inquiry, the 2008 ALJ found that Sims had a Residual Functional Capacity (RFC) to perform sedentary work. He also determined that Sims' statements concerning the intensity, persistence, and limiting effects of her symptoms were not supported by the weight of the medical evidence to the degree alleged. The ALJ relied primarily on the testimony of Dr. Alexander, the medical examiner who saw Sims in 2006 for her disability evaluation, as well as various physicians at the Truman Medical Center who saw Sims between 2006 and 2008. He also stated that Sims' present part-time employment made her claim that she was unable to work not credible. Based on the testimony of the vocational expert, the 2008 ALJ determined that although Sims' impairments prevented her from performing her past employment, there were jobs in the national economy that Sims could perform.

##### 2. *Decision of the ALJ at the 2011 Hearing*

The Magistrate Judge at the District Court heard Sims' appeal in January 2010 and remanded the case for reassessment of Sims' credibility. ALJ Lauren Mathon conducted a second hearing for Sims in February 2011. This ALJ ("2011 ALJ") determined the following: 1) although Sims had worked part-time for two months after the alleged onslaught of her disability, this work was not substantially gainful; 2) Sims has the severe impairments of status post left knee replacement and arthroscopy, status post left femur fracture, osteoarthritis, obesity, diabetes, degenerative joint disease, and depression; 3) the impairments separately or in combination did not meet the SSA's listing of impairments; 4) Sims' impairments prevented her from performing her previous work;

but 5) based on the testimony of the vocational aid, there were jobs available in the national economy that Sims could perform.

## II.    Discussion

The Court finds that the 2011 ALJ erred in conducting step three of the analysis by failing to find that Sims' femur fracture met Listing 1.06.  Additionally, the Court finds that the ALJ erred in assessing Sims' credibility and failed to give the opinion of Sims' treating physician, Dr. Daily, controlling weight, and that as a consequence, her determination that Sims is not disabled is not supported by substantial evidence in the record.

### A.    Legal Standard

To establish disability, a claimant must prove that she is unable to engage in substantial gainful activity by reason of a medically determinable impairment that has lasted or can be expected to last for a continuous period of 12 months or more.  *See* 42 U.S.C. § 423(d).  In reviewing the Commissioner's denial of benefits, the Court considers whether the ALJ's decision "is supported by substantial evidence in the record as a whole."  *Muncy v. Apfel*, 247 F.3d 728, 730 (8th Cir. 2001); *see also Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008).  "Substantial evidence" is less than a preponderance, but must be sufficient for a reasonable mind to find it adequate to support the conclusion. *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004); *see also Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).  The Court must consider evidence that detracts from as well as supports the ALJ's decision.  *Black v. Apfel*, 143 F.3d 383, 385

(8th Cir. 1998). The Court will affirm the ALJ's decision so long as it falls within the available "zone of choice." *See Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir. 2007).

**B.      Whether Sims' Impairments Meet the Listings**

At step three of the disability assessment, the ALJ considers whether the claimant has impairments that meet or equal those set out in the Listings. If so, the claimant is conclusively presumed disabled. Sims argues that the ALJ erred by finding that her impairments did not meet or equal Listing 1.02 and 1.06.

Under Listing 1.02A, a claimant is conclusively presumed to be disabled if she suffers from a "[m]ajor dysfunction" of a hip, knee, or ankle "[c]haracterized by gross anatomical deformity... and chronic joint pain and stiffness," which is supported by x-rays or other medical imaging of joint degeneration, and which results in the claimant's inability to ambulate effectively. 20 C.F.R. § 404 App. 1 §1.02A (2012). Under Listing 1.06, a person is conclusively presumed disabled if she suffers from a fracture of a femur with a "[s]olid union not evident on appropriate medically acceptable imaging and not clinically solid," accompanied by the inability to ambulate effectively, and where the return to effective ambulation did not occur within 12 months. 20 C.F.R. § 404 App. 1 §1.06 (2012). Effective ambulation is defined as the capability to sustain "a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." 20 C.F.R. § 404 App. 1 §1.00(B)(2)(b) (2012). Inability to ambulate is defined generally as "having insufficient lower extremity functioning... to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.*

On review, the Court must carefully analyze the entire record. *Wilcutts v. Apfel*, 143 F.3d 1134, 1136 (8th Cir. 1998). If the substantial evidence makes it equally possible to form two opposite conclusions, one of which accords with the ALJ's findings, the Court is obligated to affirm the ALJ's decision. *Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir. 1996); *see also Finch*, 547 F.3d at 935. The Court finds that the ALJ erred in finding that Sims did not meet Listing 1.06 during the period of May 2008-August 2009, but that the medical evidence is not sufficient to disprove the ALJ's conclusion that Sims did not meet the requirements of Listing 1.02 during the remaining period.

With regards to Listing 1.06, Defendant argues that there is no objective medical evidence that Plaintiff did not have a solid union of her femur fracture. [Doc. #14] However, there is in fact extensive medical evidence that Sims experienced a femur fracture that met Listing 1.06. The medical records indicate that Sims fractured her femur in May 2008, and x-rays in September 2008 revealed that the femur had failed to heal. Sims was prescribed a bone stimulator, which she used until August 2009, when her fracture was finally pronounced healed. During these fifteen months, Sims was non-weight-bearing on her left side and relied on a wheelchair, walker, and then a cane to ambulate. She testified that she had to use a shower chair and a bed commode, and relied on her family and friends for cleaning and household help. The Court finds that Sims met the requirements of Listing 1.06 from the period of May 2008-August 2009, and so Sims can be conclusively presumed disabled during this time.

Regarding Listing 1.02, the Court finds that it is a close question whether the medical evidence is sufficient to prove Sims' inability to ambulate effectively during the

remainder of the alleged period of disability. In discussing Sims' ability to ambulate, one physician at the Truman Medical Center noted in 2009 that "walking bothers [her right knee]."[2] In 2010, another physician noted that since 2008 Sims "has had increased difficulty with walking and pain in the left leg along with degenerative joint disease in her knees bilaterally."[3] Sims also testified at her 2011 hearing that she regularly uses a walker or cane. However, the record reveals no definitive statements by Sims' treating physicians that Sims is unable to walk "without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." Because it is a matter on which reasonable people could differ, the Court affirms the ALJ's finding on this issue.

### C.    Whether the ALJ Properly Determined the RFC

If a claimant's impairments do not meet or equal a Listing, the ALJ then proceeds to consider whether the claimant can perform her previous work or, if not, whether jobs exist in substantial numbers in the national economy that claimant could perform. The ALJ found that Sims could no longer perform her previous work as an aid for disabled persons, but concluded that jobs existed in the national economy that Sims could perform. Having considered the record as a whole, the Court finds that there is not substantial evidence in the record to support the  ALJ's rejection of Sim's complaints of disabling pain or the ALJ's failure to give controlling weight to the opinion of Sims' treating physician.

### i.    Whether the ALJ Properly Assessed Sims' Credibility

---

[2] TR-694.
[3] TR-643.

In analyzing a claimant's subjective complaints of pain, the ALJ must take into account "(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." *Black*, 143 F.3d at 386 (referencing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)); *see also Finch*, 547 F.3d at 935; *Casey*, 503 F.3d at 695.

Sims testified that she suffers from chronic knee and hip pain and has difficulty with daily living activities. She attests that she has used a cane or walker almost continuously since her left knee replacement in January 2006. She testified at the 2011 hearing that she uses a walker around her home, that she has trouble showering and must use a shower chair, and that she cannot perform routine household tasks like cleaning the kitchen floor. She stated that she relies on family members to accompany her shopping and perform household chores.

The ALJ must seriously consider allegations of subjective pain. *Finch*, 547 F.3d at 935; *see also Polaski*, 739 F.2d at 1322; *Karlix v. Barnhart*, 457 F.3d 742, 748 (8th Cir. 2006). Although the assessment of the credibility of a claimant's subjective testimony is primarily under the auspice of the ALJ, an ALJ who finds a claimant not credible must lay out substantial evidence of "inconsistencies in the record which cause him to reject the plaintiff's complaints." *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004).

The 2011 ALJ concluded that Sims was not credible because her claims of pain were "infrequent" and "sporadic." She emphasized particularly that Sims saw her

physician at Truman Medical for knee pain in October 2007 but "did not report for

additional treatment or complain of pain to her knees until March 2008." TR-545.

However, this statement is inaccurate, and ignores the context of Sims' treatment.

During this period, Sims had the following appointments for knee pain:

- June 2007 – Sims' physician noted that Sims reported that her right knee occasionally buckled, that she was having trouble climbing stairs and getting out of the bathtub. She was prescribed Mobic and instructed on knee exercises. Her physician noted she may be a candidate for right knee replacement.
- August 2007 – Sims was seen in sports medicine clinic and by Truman Medical physician; Sims reported she had begun water aerobics and was trying to quit smoking and lose weight. Sims was advised to continue following up with the sports medicine clinic about leg strengthening exercises. The doctor noted that Sims would continue Mobic as needed for pain. She was scheduled for a follow up appointment in one month.
- September 2007 – The physician refilled Sims' Mobic prescription, administered a right knee injection, and recommended leg strengthening exercises and water aerobics; Sims was scheduled for a follow-up appointment in one month.
- October 3, 2007 - The physician refilled Sims' Mobic prescription, administered a bilateral knee injection, and recommended physical therapy. Sims was scheduled for a follow-appointment in one month.
- October 31, 2007 – Sims' physician noted that Sims reported performing exercises and trying to lose weight; that Mobic and injections were helpful in alleviating her pain; but that Sims could not go to physical therapy because she could not afford the co-pay. The physician recommended she continue with the prescribed treatment plan and follow up in three months.
- December 2007 – Sims reported her pain is well controlled with Mobic. The physician noted that her next appointment with the Sports Medicine Clinic was in three months.
- March 2008 – Sims reported constant knee pain and received a shot in her right knee. The physician increased her Mobic dosage for a limited period of time.

As this review of the record shows, the ALJ's claim of a six-month gap between

Sims' October 2007 and March 2008 appointments is false. Furthermore, the record

indicates that her physicians were systematically lengthening the period between follow-up appointments, from one to two to eventually three months, as the treatment plan provided appeared to be taking effect. Thus, the ALJ's determination that Sims was not credible on the basis of "infrequent" or "sporadic" treatments is not at all supported by the record.

The ALJ also discounted Sims' complaints about pain on the grounds that Sims "is able to perform activities of daily living such as shopping for food, does laundry, uses a computer and is able to drive [sic]." TR-545. However, the ability to engage in daily life activities, at a reduced pace and within a confined scope, does not guarantee the ability to perform a full-time job in a competitive atmosphere. "As we have repeatedly held, the inquiry must focus on the claimant's ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *Tang v. Apfel*, 205 F.3d 1084, 1086 (8th Cir. 2000); *see also Brosnahan v. Barnhart*, 336 F.3d 671, 677 (8th Cir. 2003). As Sims testified, she experiences significant limitations on her ability to engage in routine daily activities, such as shopping, cleaning, and personal care. These limitations are supported by the medical opinions both of Sims' treating physicians as well as the state examiners Drs. Alexander and Gamayo, who noted that Sims had trouble with showing, dressing, and cleaning. There is thus insufficient basis in the record to support the ALJ's conclusion that because Sims can perform limited daily life activities, her testimony about her pain is not credible.

The 2008 ALJ based his determination that Sims was not credible on the fact that she had had a consistent, long-term work record prior to the onslaught of her knee

Case 4:12-cv-00163-NKL   Document 16   Filed 11/02/12   Page 13 of 19

impairments. On appeal, Magistrate Judge Maughmer noted that Sims' work history could be interpreted differently; he remanded the case for a determination of how Sims' prior work history and attempt to return to the workforce affected her credibility, noting, "It does reflect a strong desire, effort, and motivation to return to the workforce." TR-619. However, the 2011 ALJ did not address Sims' prior work history and previous attempt to return to the workforce at all. The Court finds that Sims' history of nearly two decades of work as a mental health aid and her attempt to return to similar work prior to her femur fracture speaks to her credibility. Furthermore, the fact that Sims fell and fractured her femur shortly after attempting to return to work indicates that she does indeed have difficulty ambulating such that she is not steady on her feet.

Based on the above analysis, the Court finds that the ALJ erred in determining that Sims was not credible.

### ii. *Whether the ALJ Appropriately Weighed the Opinion of the Treating Physician*

The Court finds that the ALJ erred by not giving sufficient weight to Sims' treating physician, Dr. Daily. A treating physician's opinion is generally entitled to "controlling weight," provided it is consistent with the medical record and not called into question by more thorough medical evidence. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000); *see also Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008); *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir.1997); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Even if the ALJ determines that inconsistency or superseding medical assessments exist,s he must still "give good reasons" for disregarding the treating physician's opinion. *Prosch*,

201 F.3d at 1013 (quoting 20 C.F.R § 404.1527(d)(2)).  Yet the 2011 ALJ dismissed the opinion of Sims' treating physician, Dr. Daily, in one line, on the grounds that Dr. Daily "noted no complaints of pain or other symptoms from claimant consistent with her opinion."  TR-545.  This is inaccurate, however, as the records of Dr. Daily and the other Truman Medical Center physicians consistently refer to Sims' "persistent right hip and joint pain,"[4] "bilateral hip pain,"[5] "degenerative joint disease with right hip pain,"[6] "right knee osteoarthritis,"[7] and "evidence of sclerosis on the patient's left hip."[8]  In 2009, Dr. Daily noted that "the patient may need total hip replacement in the future" as well as "total knee replacement."[9]  Although Dr. Daily noted that injections provided relief for Sims' knee pain, in 2010 Sims was told by the orthopedic surgeons that she could no longer receive injections because she had already had too many.  There is no inconsistency between Dr. Daily's medical assessment of Sims and reports by other treating physicians in the record.  The only inconsistency is between Dr. Daily's assessment of Sims' Residual Functional Capacity ("RFC") and that of Drs. Alexander and Gamayo, the state medical experts.

Residual Functional Capacity ("RFC") is defined as "the most a claimant can still do despite his or her physical or mental limitations."  *Masterson*, 363 F.3d at 737 (internal quotes omitted).  A claimant's RFC is assessed based on the totality of the

---

[4] TR-669.
[5] TR-671.
[6] TR-674.
[7] TR-684.
[8] *Id.*
[9] TR-685.

relevant evidence in the case record, "including medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations." *Id*. This assessment also takes into account the combined effect of both "severe" and "not severe" impairments, as well as the individual claimant's susceptibility to pain. 20 C.F.R. § 404.1545(e).

In formulating Sim's RFC, the 2011 ALJ determined that Sims was unable to return to her past work as a mental health aid, but was capable of sedentary work with a sit/stand option. In determining that Sims' impairments were not debilitating, the ALJ relied primarily on the opinion of Dr. Alexander, the physician who examined Sims once in 2006, after her left knee surgery but before the onslaught of symptoms in her right knee and hips. The ALJ also relied on the RFC formulated by Dr. Gamayo, the non-examining source who formulated his conclusions about Sims' work capability based on her record in 2006. However, the opinion of a consultative physician who examines a claimant only once or not at all "is not considered substantial evidence, especially if, as here, the treating physician contradicts the consulting physician's opinion." *Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir. 2001); *see also Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998).

Sims' treating physician, Dr. Daily, conducted a function-by-function assessment of Sims' work capability in January 2010. Based on her treatment of Sims and Sims' medical record, Dr. Daily stated that Sims:

- Could stand/walk for less than two hours in an eight hour day;
- Could sit for four hours in an eight hour day;
- Could walk less than one block without severe pain;

- Would be unable to walk one block at a reasonable pace on rough or uneven surfaces;
- Would have difficulty sitting for a prolonged period of time;
- Would occasionally experience deficits in attention and concentration due to pain;
- Would require the ability to shift positions at will from sitting, standing, or walking, and would need to take unscheduled breaks throughout the day;
- Would not require the use of a cane while engaging in occasional standing or walking;
- Could rarely lift and carry less than ten pounds and could never lift and carry more than ten pounds;
- Could rarely stoop, bend, crouch, or squat and could never climb ladders or stairs;
- Would likely miss two days of work per month due to her medical condition.

This RFC assessment by Dr. Daily is amply supported by both the medical record and Sims' subjective complaints of pain.

In determining a claimant's RFC, the ALJ must conduct a function-by-function analysis of her capabilities. *See* Social Security Ruling 96-8p (noting that "a failure to first make a function-by-function assessment of the individual's limitations or restrictions" could result in an inaccurate RFC, and that "[e]ach function must be considered separately."). Yet the 2011 ALJ merely repeated the RFC assessment by the state medical examiners, stating that Sims could sit for eight hours a day; stand for four hours out of an eight-hour day; walk for two hours in an eight-hour day; lift and carry 10 pound occasionally and less than 10 pounds frequently; and occasionally climb, balance, stoop, kneel, crouch, and crawl. As noted above, however, the opinion of a non-treating source who merely examines a claimant once or not at all is not entitled to substantial weight, especially, as in this case, when it is contradicted by the opinion of a claimant's treating physician. The findings of Drs. Alexander and Gamayo therefore cannot be reasonably adopted in determining Sims' RFC when they clearly conflict with the

findings of her treating physician, Dr. Daily. This RFC formulated by Dr. Daily indicates that Sims' ability to work is much more limited than indicated by the state medical experts. The Court finds that the ALJ at the 2011 hearing erred by failing to give controlling weight to the opinions of Sims' treating physician, and as such miscalculated Sims' work capability.

At this stage of the analysis, the Defendant bears the burden of showing that jobs exist in substantial numbers in the national economy which the claimant could perform despite her limitations. 20 C.F.R. §§ 404.1545(a)(1); 20 C.F.R. § 404.1520(g). *See also Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998); *Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995). A vocational expert's testimony of the availability of jobs based on an inaccurate RFC does not have substantial weight. *McKinney v. Apfel*, 228 F.3d 860, 865 (8th Cir. 2000); *see also Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). Because the ALJ's RFC was inaccurate, the vocational expert's opinion that there were jobs in the national economy that Sims could perform is not entitled to substantial weight. As such, the Defendant has not borne his burden, and substantial evidence does not support the ALJ's denial of benefits.

## III.     Conclusion

The Social Security regulations authorize the district court to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Where evidence of disability is overwhelming, the court should reverse, rather than remand. *Bryant v. Bowen*, 882 F.2d 1331, 1334 (8th Cir. 1989); *see also Cunningham v. Apfel*, 222 F.3d 496, 503 (8th Cir. 2000) (where the

record contains substantial evidence supporting a finding of disability and a remand would unnecessarily delay benefits, reversal is appropriate). Because the Court finds that the ALJ's denial of benefits was not based on substantial evidence in the record, and that substantial evidence supports a finding of disability, the Court REVERSES the ALJ's decision and REMANDS the case for a determination of benefits consistent with this opinion.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: November 2, 2012
Jefferson City, Missouri